# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES PIAZZA and EVELYN PIAZZA,<br><br>Plaintiffs.<br><br>v.<br><br>BRENDAN YOUNG, DANIEL CASEY, BRAXTON BECKER, MICHAEL BONATUCCI, RYAN BURKE, JERRY COYNE, GARY DIBILEO, JR., JOSEPH EMS, CASEY FUNK, EDWARD JAMES GILMARTIN, III, CRAIG HEIMER, JONATHAN KANZLER, LARS KENYON, NICHOLAS KUBERA, JOSHUA KURCZEWSKI, JONATHAN MARTINES, ADAM MENGDEN, JOSHUA MONCKTON, JONAH NEUMAN, AIDAN O'BRIEN, DONALD PRIOR, MATTHEW REINMUND, LUCAS ROCKWELL, JOSEPH SALA, MICHAEL ANGELO SCHIAVONE, BOHAN SONG, LUKE VISSER, PARKER YOCHIM, and ST. MORITZ SECURITY SERVICES, INC.<br><br>Defendants. | No. 4:19-CV-00180<br><br>(Judge Brann) |

## MEMORANDUM OPINION

### AUGUST 27, 2019

All Defendants moved to dismiss various portions of the complaint filed by James and Evelyn Piazza. Several Defendants also moved to stay this case. As discussed below, those motions will be granted in part and denied in part.

# I.    BACKGROUND[1]

At all relevant times, Defendants Brendan Young, Daniel Casey, Braxton Becker, Michael Bonatucci, Ryan Burke, Jerry Coyne, Gary DiBileo, Joseph Ems, Casey Funk, Edward Gilmartin, Craig Heimer, Jonathan Kanzler, Lars Kenyon, Nicholas Kubera, Joshua Kurczewski, Jonathan Martines, Adam Mengden, Joshua Monckton, Jonah Neuman, Aidan O'Brien, Donald Prior, Matthew Reinmund, Lucas Rockwell, Joseph Sala, Michael Angelo Schiavone, Bohan Song, Luke Visser, and Parker Yochim[2] were members of the Alpha Upsilon Chapter of the Beta Theta Pi fraternity at The Pennsylvania State University. In early 2017, Mr. Young invited the Piazzas' son Timothy to join that fraternity.[3] In fraternity lingo, that invitation, or "bid," turned Timothy into a "pledge."[4] Timothy planned to accept that bid at a party—"Bid Acceptance Night"—held at the fraternity house on February 2, 2017.[5]

---

[1]    The material in this section is draw from the allegations in Piazzas' Complaint (ECF No. 1). At this stage, the allegations are presumed true. *See Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (noting that, when considering a motion to dismiss, a court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]").

[2]    This opinion will refer to these twenty-eight individuals collectively as "Defendants."

In addition to these Defendants, the Piazzas also sued St. Moritz Security Services, Inc., a security firm that made a brief inspection of the fraternity house that evening. *Id.* ¶¶ 245-252. St. Moritz, however, moves only to dismiss the Piazzas' demand for punitive damages. That argument will be addressed below.

[3]    *Id.* ¶ 151.

[4]    *Id.* ¶¶ 151-52.

[5]    *Id.* ¶ 177.

In the week leading up to Bid Acceptance Night, Mr. Heimer, at the direction of Mr. Schiavone, purchased $1,179.30 worth of alcohol for the party.[6]  On February 2, 2017, Mr. Casey—identifying himself as the "pledge master"—texted Timothy Piazza specific instructions about where and when to arrive that evening.  ("Be outside the kitchen doors behind the house at 9:07.")[7]  The instructions laid out a strict dress code requirement—"shirt, tie[,] and jacket"—and warned Timothy that "[i]t would be wise not to be late."[8]

Timothy attended Bid Acceptance Night with 13 other pledges.[9]  Upon arrival, Mr. Burke led the pledges to the basement, where Mr. Young addressed them, signaled to Mr. Casey to take over, and left.[10]  Mr. Sala handed Mr. Casey a large bottle of vodka, which Mr. Casey directed the pledges to pass amongst themselves until it was empty.[11]

After the vodka was fully consumed, Mr. Sala led the pledges outside and directed them to reenter the house one-by-one to participate in a series of drinking events called "the Gauntlet."[12]  The purpose of the Gauntlet was to get the pledges

---

[6]  *Id.* ¶ 161.

[7]  *Id.* ¶ 176.

[8]  *Id.*

[9]  *Id.* ¶ 177.

[10]  *Id.* ¶ 181.

[11]  *Id.* ¶ 182-84.

[12]  *Id.* ¶ 187.

quickly intoxicated.[13] Mr. Young oversaw the Gauntlet, and forced the pledges to participate in it.[14]

The Gauntlet began with the "vodka station."[15] After Mr. Sala directed each pledge into the house individually, Mr. Casey handed each pledge another bottle of vodka and forced the pledge to drink from it.[16] After the required drink, Mr. Funk took the bottle from each pledge and handed it back to Mr. Casey, who instructed the pledge to run down a hallway to the next drinking station.[17] Mr. Funk pushed the pledge towards that station.[18]

The next station was the "shotgun station," where each pledge was required to quickly consume an entire can of beer through a hole placed in the side of the can.[19] Mr. Bonatucci brought the beer to the premises for use in this station; Mr. Bonatucci and Mr. Kubera placed the beers in the shotgun station; and Mr. Bonatucci, Mr. Neuman, and Mr. Kubera handed the to-be-shotgunned beers to each pledge.[20] (Mr. Kubera was the fraternity member who handed Timothy Piazza his

---

[13] *Id.* ¶ 189.

[14] *Id.* ¶ 188.

[15] *Id.* ¶ 191.

[16] *Id.* ¶ 191-93.

[17] *Id.* ¶¶ 194, 196.

[18] *Id.* ¶ 194.

[19] *Id.* ¶ 197.

[20] *Id.* ¶ 198-201.

beer here.[21])  While pledges were at this station, Mr. Kubera, Mr. Coyne, and Mr. Ems poured beer over them.[22]

Pledges were then directed to the "wine station" by Mr. Ems, Mr. Coyne, and Mr. Prior.[23]  There, Mr. DiBileio required the pledges to drink from a bag of wine.[24]

The Gauntlet concluded with the "beer pong station."[25]  There, Mr. Visser required them to throw a ball into a plastic cup filled with beer.[26]  If the pledge missed the cup with the ball, Mr. Visser required him to drink the beer in the cup.[27]

After the Gauntlet, the pledges were lined up along a wall in the basement, where Mr. Kurczewski gave them another beer to drink.[28]  The pledges and the fraternity members remained in the basement for some time; while there, the fraternity members "walked around . . . carrying wine bags and cans of beer, and forced, encouraged, and caused pledges" to continue drinking.[29]  At this point, Timothy was "visibly intoxicated"[30] and "stuporous."[31]  Nevertheless, numerous

---

[21]  *Id.* ¶ 203.

[22]  *Id.* ¶ 202.

[23]  *Id.* ¶ 206.

[24]  *Id.* ¶ 207.

[25]  *Id.* ¶ 208.

[26]  *Id.* ¶¶ 209-10.

[27]  *Id.* ¶ 211.

[28]  *Id.* ¶¶ 214-15.

[29]  *Id.* ¶ 221.

[30]  *Id.* ¶ 216.

[31]  *Id.* ¶ 217.

Defendants—including Mr. O'Brien, Mr. Visser, Mr. DiBileo, Mr. Burke, Mr. Kanzler, Mr. Kubera, and Mr. Song—continued to provide alcohol for him to drink.[32]

The events of Bid Acceptance Night lasted approximately 90 minutes, during which time Timothy consumed eighteen alcoholic drinks.[33] At the conclusion of that binge, his blood alcohol concentration was somewhere between 0.28 and 0.36,[34] and he was "stagger[ing] throughout the basement, visibly intoxicated."[35] Mr. Kenyon and Mr. Kubera therefore assisted him to a couch on the first floor.[36]

Timothy apparently did not stay on the couch. At 11:20pm, he fell down the basement stairs, "suffering serious injuries."[37] The fall rendered him unconscious.[38]

When Mr. Neuman saw Timothy lying "torso face down" at the bottom of the steps, Mr. Neuman, Mr. Burke, and Mr. Visser carried him back up the stairs and onto a first floor couch.[39] Someone removed Timothy's shirt, revealing a visible bruise on the left side of his abdomen.[40] Mr. Burke lifted Timothy's left arm and let

---

[32] *Id.* ¶¶ 235-242.

[33] *Id.* ¶ 243.

[34] *Id.* ¶ 256.

[35] *Id.* ¶ 244.

[36] *Id.* ¶¶ 253-54.

[37] *Id.* ¶ 257.

[38] *Id.* ¶ 258.

[39] *Id.* ¶ 262.

[40] *Id.* ¶ 263.

it go, but the arm immediately fell back down.[41]  Mr. Prior then poured liquid on Timothy's face, but Timothy remained unconscious and non-responsive.[42]

Timothy eventually began vomiting, causing Mr. Neuman to retrieve a bucket.[43]  To keep him off his back and to prevent him from aspirating on his own vomit, Mr. Neuman and others—including Mr. Coyne and Mr. Ems—attached a backpack full of books to Timothy's back.[44]  Eventually, Mr. Neuman sat on Timothy's legs to keep him from moving.[45]

Timothy then began "thrashing and making odd movements and sounds."[46] An unidentified fraternity member urged Defendants—including, specifically, Mr. Neuman, Mr. Gilmartin, Mr. Prior, and Mr. Ems—to call for medical help.[47]  Rather than make that call, Mr. Neuman pushed the unidentified fraternity member "across the room and shoved him against a wall."[48]  Defendants—including, specifically, Mr. Neuman and Mr. Gilmartin—discouraged other fraternity members from calling

---

[41]  *Id.* ¶ 265.

[42]  *Id.* ¶¶ 266-67.

[43]  *Id.* ¶¶ 267-70.

[44]  *Id.* ¶ 271-72.

[45]  *Id.* ¶ 276.

[46]  *Id.* ¶ 277.

[47]  *Id.* ¶ 278.

[48]  *Id.* ¶ 279.

911, from taking Timothy to the hospital, and from otherwise seeking medical assistance for him.[49]

At 11:53pm, an unidentified fraternity member texted all the other fraternity members—including all Defendants—that:

> Tim [Piazza] might actually be a problem.  He fell[] 15 feet down a flight of stairs hair first.  Going to need help.[50]

Instead of obtaining help, Defendants attempted to rouse Timothy into consciousness with force.  Mr. Casey slapped him in the face three times, and Mr. Reinmund tackled Mr. Kanzler into him.[51]  Neither attempt worked, and Timothy remained "prone and unconscious."[52]

Timothy struggled through the night.  At 1:37am, in front of Mr. Coyne and Mr. Ems, he began twitching and vomited again.[53]  At 2:25am, he rolled off the couch and onto the floor.[54]  Mr. Ems and Mr. Reinmund put him back in place,[55] and Mr. Ems engaged in another attempt to rouse him by force by slapping him in the stomach.[56]  Timothy remained unconscious.[57]

---

[49]  *Id.* ¶ 280.

[50]  *Id.* ¶ 281.

[51]  *Id.* ¶¶ 282, 284.

[52]  *Id.* ¶¶ 283-85.

[53]  *Id.* ¶ 286.

[54]  *Id.* ¶ 287.

[55]  *Id.* ¶ 288.

[56]  *Id.* ¶ 290.

[57]  *Id.* ¶ 291.

At 3:59am, Timothy rolled off the couch again, the backpack falling off.[58] As he attempted to stand up, he fell backwards and struck his head on the floor.[59] Mr. Coyne observed this, attempted to shake Timothy, and exited the room, leaving Timothy alone and unattended.[60] At 4:26am, Timothy raised himself onto his knees, "bent over with his elbows on the floor, his head in his hands, . . . grabbing his abdomen."[61] At 4:31am, he fell face down onto the living room's hardwood floor.[62] At 5:36am, attempting to walk around, Timothy fell head first into an iron railing leading to the second floor of the fraternity house.[63] He then attempted to exit the house but fell head first into the house's front door.[64] At 5:52am, Mr. Martines approached Timothy as he was lying on the floor.[65] Mr. Martines did not provide any aid and left Timothy's presence.[66]

At 10:48am on February 3, 2017—more than eleven hours after Timothy fell down the stairs—an unidentified fraternity member called 911.[67] Timothy was

---

[58] *Id.* ¶ 292.

[59] *Id.* ¶ 293.

[60] *Id.* ¶ 294.

[61] *Id.* ¶ 296.

[62] *Id.* ¶ 297.

[63] *Id.* ¶ 298.

[64] *Id.* ¶ 299.

[65] *Id.* ¶ 300.

[66] *Id.* ¶ 301.

[67] *Id.* ¶ 303.

immediately taken to the hospital by ambulance, and subsequently to another hospital by helicopter.[68]

Defendants spent the next two days attempting to cover up their conduct. Mr. Young texted Mr. Casey to "[m]ake sure the pledges clean the basement and get rid of any evidence of alcohol."[69] Mr. Casey agreed and reported back to Mr. Young that the pledges were "taking care of" it.[70] Mr. Casey texted Mr. Kenyon to eliminate a chain of electronic messages (exchanged through the social media program GroupMe) sent between the fraternity members and pledges "so there's no evidence on [Timothy's] phone."[71] Mr. Gilmartin texted Mr. Ems and Mr. Kenyon with similar instructions,[72] expressing concern that certain individuals might "get screenshots . . . that could leak to the media."[73] Mr. Kenyon assured Mr. Gilmartin that he could delete them permanently.[74] Mr. Young and Mr. Ems later eliminated certain accounts associated with those GroupMe messages.[75]

---

[68]  *Id.* ¶¶ 304-05.

[69]  *Id.* ¶ 307.

[70]  *Id.*

[71]  *Id.* ¶ 308.

[72]  *Id.* ¶ 315.

[73]  *Id.* ¶ 316.

[74]  *Id.*

[75]  *Id.* ¶¶ 312-13.

Mr. Mengden texted Mr. Becker that "[e]rasing the [surveillance] cameras [in the fraternity house] could be the look as long as no one found out."[76]  Mr. Becker replied that his plan was to falsely assert that the cameras were not turned on.[77] Later, Mr. Becker simply erased the footage from surveillance cameras in the basement.[78]  Mr. Becker also directed another fraternity member to erase an online forum associated with the fraternity (hosted on Facebook), admitting that "[w]e got sloppy" and recognizing that another fraternity member had been warning others "for the last few days" about the danger of the planned drinking activities "but no one listened."[79]

Timothy Piazza died from his numerous injuries[80] on February 4, 2017, at the age of nineteen.[81]  The Piazzas initiated this suit by filing a fourteen-count Complaint on January 31, 2019.  Defendants now seek to dismiss portions of that Complaint.

## II.   DISCUSSION

When considering a motion to dismiss for failure to state a claim upon which relief may be granted,[82] a court assumes the truth of all factual allegations in the

---

[76]   *Id.* ¶ 310.

[77]   *Id.* ¶ 310.

[78]   *Id.* ¶ 311.

[79]   *Id.* ¶ 314.

[80]   *See id.* ¶ 354 (noting that Timothy suffered, *inter alia*, a skull fracture and brain hemorrhaging).

[81]   *Id.* ¶ 306.

[82]   Federal Rule of Civil Procedure 12(b)(6).

plaintiff's complaint and draws all inferences in favor of that party;[83] the court does not, however, assume the truth of any of the complaint's legal conclusions.[84] If a complaint's factual allegations, so treated, state a claim that is plausible—i.e., if they allow the court to infer the defendant's liability—the motion is denied; if they fail to do so, the motion is granted.[85]

## A.     Counts I and II – Negligence of Fraternity Defendants

Counts I and II of the Complaint are negligence claims. Count I is brought against all Defendants based on their alleged role as planners of Bid Acceptance Night. Count II is brought against Defendants who allegedly furnished alcohol to the pledges at some point during the party. Defendants argue that the Complaint fails to plausibly allege the necessary elements of these claims. This Court disagrees.

### 1.     Duty of Care

Defendants argue that the negligence claims in Counts I and II should be dismissed because the Complaint fails to plausibly allege a duty between Defendants and Timothy Piazza.[86] This Court disagrees.

---

[83]  *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

[84]  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *See also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016).

[85]  *Connelly*, 809 F.3d at 786.

[86]  *See Kenner v. Kappa Alpha Psi Fraternity, Inc.*, 808 A.2d 178, 181 (Pa. Super. Ct. 2002) (noting that succeeding on a negligence claim requires showing that the defendant owed the plaintiff a duty of care).

In its 2002 decision in *Kenner v. Kappa Alpha Psi Fraternity, Inc.*, the Pennsylvania Superior Court held that members of a fraternity owed a duty to protect pledges from harm while the pledges are being initiated into the fraternity.[87] There, a pledge was beaten severely by fraternity members during an initiation meeting.[88] The pledge then brought a negligence claim against the fraternity, several of its officers, and the fraternity members who beat him.[89] The trial court held the individual defendants owed no duty of care to plaintiff and entered summary judgment in defendants' favor.[90] On appeal, the Pennsylvania Superior Court disagreed and reversed.[91] Analyzing factors laid out by the Pennsylvania Supreme Court in an earlier case,[92] the Superior Court noted the "social utility of [the] fraternity's efforts to stop hazing"; that the "nature of the harm [suffered by plaintiff was] clear and certainly foreseeable"; that the "consequences of imposing [the] duty [were] minimal," since the fraternity had "taken steps to protect initiates by banning hazing"; and the "substantial public interest in assuring that individuals will not die or suffer substantial injury in an attempt to become members of a fraternity."[93] That

---

[87]   *Id.* at 183.

[88]   *Id.* at 180.

[89]   *Id.*

[90]   *Id.*

[91]   *Id.* at 184.

[92]   *Id.* at 182-83 (discussing factors from *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166 (Pa. 2000)).

[93]   *Id.* at 182-83.

court also noted that the individual defendants had signed agreements with the fraternity that required them to "do all as officers and members to prevent any violation of the [fraternity's] statutes,"[94] which statutes included a ban on hazing.[95] As a result, the court "conclude[d] that the individual defendants [had] a duty to protect [the pledge] from harm."[96]

A similar analysis applies here. In the first place, the policy considerations analyzed by the Pennsylvania Superior Court—e.g., the social utility of stopping hazing, the foreseeability of harm, the public interest in keeping pledges alive during initiation—apply essentially identically to these alleged facts. And like the *Kenner* defendants, Defendants here were bound by Beta Theta Pi's Code of Regulations, which declared "[h]azing activities" as "absolutely forbidden,"[97] and by the fraternity's Risk Management Policy, which declared (1) that "[n]o [fraternity] members shall permit, tolerate, encourage[,] or participate in 'drinking games' or other activities that encourage excessive consumption of alcohol," and (2) that "[n]o alcohol shall be present at any recruitment activity, pledge activity[,] or induction, pre-initiation[,] and initiation ceremonies."[98]

---

[94]  *Id.* at 183.

[95]  *Id.* at 179 (noting executive orders prohibiting hazing).

[96]  *Id.* at 183.

[97]  Complaint ¶ 74.

[98]  *Id.* ¶¶ 75-76.

It is true that, in *Kenner*, only the fraternity's officers had moved for summary judgment in the trial court; that the appeal therefore was only brought by those defendants; and that the holding of the case could be narrowly read only as imposing a duty on fraternity officers, not run-of-the-mill fraternity members. This Court, however, does not read the Pennsylvania Superior Court's analysis in such a constrained fashion. After all, the Pennsylvania Superior Court specifically noted evidence showing that "*all of the named defendants* were responsible for preventing hazing"[99] and held that the fraternity officers owed a duty of care to the pledge

---

[99] *Kenner*, 808 A.2d at 183 (emphasis added).

The Pennsylvania Superior Court might have been implicitly relying on Section 324A of the Second Restatement of Torts, which in certain circumstances imposes a duty of care upon an actor (here, the fraternity members) based on the actor's contractual agreement with a third party (here, the fraternity). *See Farabaugh v. Pennsylvania Turnpike Com'n*, 911 A.2d 1264, 1283 (Pa. 2006) ("It has long been the law of this Commonwealth that a contracting party may owe a duty, imposed by law and society, to perform its contractual obligations in such a manner as to avoid injury to third parties. Generally, a party to a contract does not become liable for a breach thereof to one who is not a party thereto. However, a party to a contract *by the very nature of his contractual undertaking* may place himself in such a position that the law will impose upon him a duty to perform his contractual undertaking in such a manner that third persons—strangers to the contract—will not be injured thereby.") (emphasis added).

Plaintiffs argue that Counts I and II survive on a Section 324A-based duty. Specifically, Plaintiffs argue that Defendants had a duty to initiate the pledges with reasonable care because they were all bound by fraternity rules prohibiting hazing during the initiation process. Plaintiffs also argue that Section 322 of the Second Restatement of Torts ("If the actor knows or has reason to know that by his conduct, whether tortious or innocent, he has caused such bodily harm to another as to make him helpless and in danger of further harm, the actor is under a duty to exercise reasonable care to prevent such further harm.") provides the basis for a duty on Counts I and II as well. Specifically, Plaintiffs argue that Defendants had a duty to prevent further harm to Timothy Piazza once they knew that their hazing caused him to be so intoxicated that he could not care for himself. Because this Court will conclude that the Piazzas have plausibly alleged a *Kenner*-based duty for Counts I and II, this Court need not—and therefore does not—analyze these other duties. Their existence vel non may, however, be raised at the summary judgment stage.

despite having no personal relationship with him.[100]  It would make little sense to read that court's opinion as standing for the proposition that pledges are owed duties of care by fraternity officers whom they have never met, but not by fellow fraternity members with whom they socialize,[101] especially when the officers and members have all agreed to be bound by the same fraternity rules and regulations.

Defendants attempt to use the Pennsylvania Supreme Court's decision in *Kapres v. Heller*[102] to absolve themselves of liability, but the principle announced there is distinguishable.  Many jurisdictions recognize what is known as the "social host doctrine"—i.e., a "claim in negligence against a person (the host) who provides alcohol beverages to another (the guest), without remuneration, where the guest then sustains injuries, or causes injury to a third person as a result of his intoxicated condition."[103]  Under this doctrine, either the guest or the third party can recover from the host for injuries sustained.[104]  The Pennsylvania Supreme Court, however, has expressly declined to recognize this theory of liability,[105] except in situations

---

[100] *Kenner*, 808 A.2d at 183 (noting that the pledge paid an application fee and signed a membership agreement to join the fraternity, making the relationship between him and the defendants "at a minimum, contractual in nature, requiring performance by both parties").

[101] *See id.* at 182 (noting that "the relationship between the parties" is one of the factors to be considered when determining whether a duty is exists them).

[102] 640 A.2d 888 (Pa. 1994).

[103] *Id.* at 889 n.1.

[104] *Id.*

[105] *Klein v. Raysinger*, 470 A.2d 507 (Pa. 1983).

where the host is an adult and the guest is an individual under 21 years of age.[106]  In those cases, liability is premised on a negligence-per-se theory—i.e., a determination, based on the legislature's decision to prohibit the furnishing of alcohol to minors, to "defin[e] a duty of care on the part of adults vis-à-vis their minor guests."[107]  An adult breaches this duty as soon as they serve any amount of alcohol to a minor; it is not necessary that the plaintiff show that he became intoxicated.[108]  The narrowness of this theory of liability was emphasized in *Kapres*, where the Pennsylvania Supreme Court held that the social host doctrine may not be used to hold minors liable for serving alcohol to other minors.

Several Defendants—presumably, all of those who were under 21 on February 2, 2017—seek an expansive interpretation of *Kapres*, essentially arguing that it immunizes them from liability for their otherwise-wrongful conduct if that conduct involves the provision of alcohol.  But this Court does not read *Kapres* so broadly.  In the first place, *Kapres* itself recognizes that its holding was merely a refusal to expand the narrow "exception"[109] to the general bar against recovery under the social host doctrine[110]—in other words, a refusal to create new theories of liability, not an

---

[106]  *Congini by Congini v. Portersville Valve Co.*, 470 A.2d 515 (1983).

[107]  *Orner v. Mallick*, 527 A.2d 521, 523 (Pa. 1987).

[108]  *Id.* at 524.

[109]  *Kapres*, 640 A.2d at 891; *see also Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174, 1187 n.14 (Pa. 2010) (describing the *Congini* rule as an "*exception* to the general rule against social host liability")

[110]  *See Kapres*, 640 A.2d at 891 (noting that its holding is "more logical *and consistent with the prevailing view on social host liability in this Commonwealth*") (emphasis added).

immunization of a certain class of defendants for certain conduct. In the second place, *Kapres* relied on the fact that it would be "illogic[al]" to hold minors liable under an exception meant to "specially afford[]" certain "protections" to minors.[111] But here, of course, the Piazzas are not proceeding under the protectionary shield of the social host doctrine; they are seeking instead to hold Defendants liable for breaching the protective duty they, as fraternity members, owed to the Piazzas' son, a fraternity pledge.

It is true that *Kapres* repeatedly spoke of minors being "incompetent to handle alcohol" as a basis for its holding, a principle distilled from the statute criminalizing the furnishing of alcohol to minors.[112] That language, however, does not resolve the matter since, as *Kapres* itself recognized, minors are "responsible under the law for their own actions in furnishing or consuming alcohol."[113] And if criminal statutes are to be used when determining the existence of a duty,[114] this Court cannot ignore the anti-hazing statute in effect at the time of Defendants' conduct, which criminalized the "forced consumption of any . . . liquor, drug[,] or other substance

---

[111] *Id.* at 891.

[112] *Id.*

[113] *Id.; see also Commonwealth v. Lawson*, 759 A.2d 1, 4 (Pa. Super. Ct. 2000) (noting "apparent paradox between the absence of civil liability regarding minors serving alcohol to other minors, and the affirmative attachment of criminal liability for the same act").

[114] *See Orner*, 527 A.2d at 523 (implying that the holding of *Congini* is based on Section 286 of the Restatement (Second) of Torts, which section states that "court[s] may adopt as the standard of conduct . . . the requirements of a legislative enactment . . . whose purpose is found to be[, inter alia,] to protect a class of persons which includes the one whose interest is invaded . . . .").

. . . which could adversely affect the physical health and safety of the individual."[115] If the anti-furnishing law reveals the legislature's desire to protect minors from adults who irresponsibly funnel liquor to children, the anti-hazing law reveals the legislature's desire to protect young adults like Timothy Piazza from abuse at the hands of their similarly aged peers. The Complaint, therefore, has plausibly alleged that all Defendants owed Timothy Piazza a duty of care to protect him from harm while he was being initiated.

### 2.    Breach and Causation

Defendants also argue that the Complaint fails to plausibly allege that they breached their duty to protect Timothy Piazza or that their breach caused Timothy's injuries. This Court disagrees.

Regarding breach, the Complaint alleges that Mr. Young, Mr. Gilmartin, Mr. Casey, Mr. Mengden, Mr. Burke, Mr. Schiavone, Mr. Reinmund, Mr. Martines, Mr. Becker, Mr. Sala, Mr. Prior, Mr. Ems, Mr. Kenyon, Mr. Rockwell, Mr. Yochim, and Mr. Monckton were members of fraternity-related committees that "planned, orchestrated, [and] organized" the events of Bid Acceptance Night.[116] And the Complaint alleges that Mr. Bonatucci, Mr. Coyne, Mr. DiBileo, Mr. Funk, Mr. Heimer, Mr. Kanzler, Mr. Kubera, Mr. Kurczewski, Mr. Neuman, Mr. O'Brien, Mr. Song, and Mr. Visser directly participated in the setup or operation of the events that

---

[115]  24 P.S. § 5352 (2017).

[116]  Complaint ¶¶ 95, 113-14, 125-26, 135-36, 142.

evening.[117]  Defendants challenge the sufficiency of these allegations, arguing that they fail to satisfy Fed. R. Civ. P. 8(a)(2)'s requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief."  However, while the Supreme Court of the United States has interpreted this rule as requiring plaintiffs to plead facts showing "more than a sheer possibility that a defendant has acted unlawfully,"[118] there is no requirement of "detailed pleading"—i.e., a plaintiff need not plead facts showing that a defendant's liability is probable.[119]  Instead, a plaintiff need only "plead[] factual content that allows the court to draw the reasonable inference that [a] defendant is liable for the misconduct alleged."[120]

The Piazzas' Complaint satisfies this standard.[121]  Each Defendant is alleged to have played a role in Bid Acceptance Night as a planner, a participant, or both. Consequently, this Court can—and therefore must—infer that each Defendant,

---

[117]  *See id.* ¶ 161 (alleging that Mr. Heimer purchased the alcohol for February 2, 2017); *id.* ¶ 194 (alleging that Mr. Funk operated the vodka station); *id.* ¶ 198 (alleging that Mr. Bonatucci and Mr. Neuman operated the shotgun station); *id.* ¶ 206 (alleging that Mr. Coyne directed pledges from the shotgun station to the wine station); *id.* ¶ 215 (alleging that Mr. Kurczewski provided alcohol to Timothy in the basement); *id.* ¶¶ 235-242 (alleging that Mr. O'Brien, Mr. Visser, Mr. DiBileo, Mr. Kanzler, Mr. Kubera, and Mr. Song provided alcohol to Timothy Piazza in the basement).

[118]  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *id.* (noting that allegations "merely consistent with a defendant's liability . . . stop[] short of the line between possibility and plausibility of entitlement of relief").

[119]  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016).

[120]  *Iqbal*, 556 U.S. at 678.

[121]  For this reason, Defendants' request for a more definite statement pursuant to Rule 12(e) will also be denied.  *See Betancourt v. Marine Cargo Management, Inc.*, 930 F. Supp. 606, 608 (S.D. Fl. 1996) ("In considering . . . a motion [for a more definite statement], the Court should be mindful of the liberal pleading requirements of [Rule 8(a)(2)], pursuant to which a 'short and plain statement of the claim" will suffice.').

collectively or individually, made an important contribution to either the design or the execution of the events that evening, even if some Defendants did not directly hand Timothy Piazza a drink.[122]   Discovery may reveal that some Defendants' conduct was blameless or insignificant such that they are entitled to summary judgment.  At this stage, however, the allegations of planning and participation allow this Court to conclude that the Complaint has plausibly alleged that Defendants breached the duty of care they owed to Timothy Piazza.

Regarding causation, this Court can, and therefore must, infer that the events of February 2, 2017—i.e., the preplanned consumption of enormous quantities of numerous types of alcohol—were the actual, but-for cause of Timothy Piazza's death.   After all, had Timothy not been invited to that party, he would not have become so intoxicated there that he fell down Defendants' stairs, suffering an injury so severe that he lost the ability to care for himself and eventually resulted in his death.   Regarding proximate cause, while discovery may reveal that some Defendants' conduct was "*de minimis* and not a substantial factor contributing to [Timothy's] untimely demise,"[123] at this stage this Court can—and therefore must— infer that each Defendants' participation in that night's events, whether as planner

---

[122] Defendants raise a Rule 8(a)(2) challenge to other Counts of the Complaint.  This same analysis applies to those Counts as well.

[123]  *Goldberg v. Delta Tau Delta*, 613 A.2d 1250, 1255 (Pa. Super. Ct. 1992).

or participant, played some important contributory role to Timothy's harm.[124]  The Complaint has therefore plausibly alleged causation.

### B.    Count III – Negligence After the Fall

Count III alleges (1) that a number of Defendants provided aid to Timothy Piazza the night of February 2, 2017; (2) that this provision of aid established a duty of care between those Defendants and Timothy; (3) that those Defendants breached that duty of care; and (4) that that breach caused or contributed to Timothy's injury and death.  Defendants argue that this claim fails at steps one and two—i.e., that the Complaint fails to allege that they provided aid to Timothy that evening such that a duty of care was created.  This Court agrees with some of these Defendants, but disagrees with the others.

Pennsylvania courts recognize Sections 323 and 324 of the Second Restatement of Torts.[125]  Section 323 states that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

---

[124] *See Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978) ("Proximate cause is a term of art denoting the point at which legal responsibility attaches for the harm to another arising out of some act of the defendant . . . and it may be established by evidence that the defendant's negligent act or failure to act was a substantial factor in bringing about the plaintiff's harm.").

[125] *See Karavas v. Poulos*, 113 A.2d 300, 303 (Pa. 1955) (recognizing Section 324 of the First Restatement of Torts, the language of which was replicated identically in Section 324 of the Second Restatement of Torts); *Filter v. McCabe*, 733 A.2d 1274, 1277 (Pa. Super. Ct. 1999) (recognizing Sections 323 and 324 of the Second Restatement of Torts).

| (a) | his failure to exercise such care increases the risk of such harm, or |
| --- | --- |

| (b) | the harm is suffered because of the other's reliance upon the undertaking. |
| --- | --- |

And Section 324 states that:

One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by

| (a) | the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or |
| --- | --- |

| (b) | the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him. |
| --- | --- |

In other words, while an individual may "pass by on the other side" of an injured party without facing tort liability, a "Good Samaritan" who stops to help incurs a duty to exercise reasonable care when doing so.[126]

The Pennsylvania Superior Court's decision in *Filter v. McCabe* illustrates this principle in a factual scenario that parallels the instant one.  There, the plaintiff attended a party at the defendant's home.[127]  After becoming intoxicated, the plaintiff fell and struck his head, rendering him unconscious.[128]  The defendant "revived" the

---

[126] *Filter*, 733 A.2d at 1277.

[127] *Id.* at 1275.

[128] *Id.*

plaintiff and put him on a couch.[129]  Early the next morning, the plaintiff left without telling anyone.[130]

At 9:35am, the defendant called the plaintiff's home to see if the plaintiff had made it there safely.[131]  Although the defendant spoke to the plaintiff's wife at that time, the defendant did not tell her about the plaintiff's fall until the defendant called back again an hour later.[132]  The plaintiff's wife then checked in on the plaintiff, found him nonresponsive, and called for an ambulance.[133]  The plaintiff ended up suffering permanent brain damage.[134]  The plaintiff then brought a negligence suit against the defendant, seeking to recover for his injuries, but the trial court dismissed it for failure to state a claim.[135]

The Pennsylvania Superior Court reversed.[136]  It noted that, although the defendant "witnessed [the plaintiff's] fall," the defendant "never contacted [the plaintiff's] family nor sought medical assistance" and instead "simply placed [the plaintiff on a sofa and proceeded to bed."[137]  Further, it noted that the defendant "did

---

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] *Id.*

[135] *Id.*

[136] *Id.* at 1279.

[137] *Id.* at 1278.

not [initially] inform [the plaintiff's wife] of the fall," but "instead waited another hour to call her and explain what had occurred the prior evening."[138] On these facts, the Pennsylvania Superior Court believed it "clear that [the defendant] took charge of the helpless, injured [plaintiff] after his fall"[139]—i.e., that the defendant owed the plaintiff a duty of care pursuant to Sections 323 and 324 of the Second Restatement.

As noted above, the Complaint alleges that, after the Gauntlet had ended, Mr. Kenyon and Mr. Kubera assisted a "stagger[ing]," "visibly intoxicated" Timothy Piazza up the stairs to a couch on the first floor.[140] The Complaint also alleges that, after Timothy left that couch and fell down the stairs, Mr. Burke, Mr. Visser, and Mr. Neuman carried Timothy—now unconscious—back up the stairs and onto the couch.[141] The Complaint then alleges that Mr. Prior, Mr. Casey, Mr. Reinmund, and Mr. Kanzler took steps to rouse Timothy during the night while he was struggling.[142] And finally, the Complaint alleges that Mr. Neuman, Mr. Coyne, and Mr. Ems placed a backpack on Timothy to prevent him from rolling on his back and aspirating in his own vomit.[143] On these alleged facts, under the rationale of *Filter*, it is plausible that Mr. Kenyon, Mr. Kubera, Mr. Burke, Mr. Visser, Mr. Neuman, Mr.

---

[138] *Id.*

[139] *Id.*

[140] Complaint ¶¶ 253-54.

[141] *Id.* ¶ 262.

[142] *Id.* ¶¶ 265-67, 282-83.

[143] *Id.* ¶¶ 271-72.

Prior, Mr. Coyne, Mr. Casey, and Mr. Ems voluntarily assumed a duty of care vis-à-vis Timothy. It is also plausible that—by, e.g., failing to seek professional medical help—these Defendants breached that duty, just like the defendant in *Filter*.[144] And that failure, of course, could plausibly have been a substantial factor in Timothy's death.

As for Mr. Young, Mr. DiBileo, Mr. Gilmartin, and Mr. Martines, the Complaint alleges, at most, that these Defendants "pass[ed] by on the other side" of Timothy after he was injured.[145] Count III against these Defendants, therefore, will be dismissed. That dismissal, however, will be without prejudice, and the Piazzas may amend their Complaint to allege facts showing that these Defendants voluntarily assumed a duty of care under Section 324 of the Second Restatement of Torts.[146]

---

[144] *See Filter*, 733 A.2d at 1278 ("The reasonableness of [the defendant's] actions in caring for [the plaintiff] once [the defendant] undertook to render aid and whether [the defendant's] discontinuing that care left [the plaintiff] in a worse position is a question of fact and, as such, must be determined by a fact finder, and not by the trial court as a matter of law.").

[145] *See, e.g.*, Complaint ¶ 264 (alleging that Mr. Young "observed [Timothy] Piazza on the couch"); *id.* ¶ 268 (alleging that Mr DiBileo "sat on the couch with Timothy"); *id.* ¶ 300 (alleging that Mr. Martines "observed Timothy Piazza lying on the floor").

[146] Mr. Funk also moved to dismiss any Count III claims against him, but the Complaint does not name him in Count III.

## C.    Count IV – Negligence Per Se for Hazing

Count IV alleges that Defendants' conduct violated Pennsylvania's anti-hazing law and that such violation amounted to negligence per se.  Defendants argue that this claim fails as a matter of law.  This Court disagrees.

A plaintiff may satisfy the duty and breach elements of a negligence claim by proving that the defendant violated a statute "designed to prevent a public harm."[147] To proceed on such a negligence-per-se theory, four requirements must be met:

(1)    The purpose of the statute must be, at least in part, to protect the interest of a group of individuals, as opposed to the public generally;

(2)    The statute or regulation must clearly apply to the conduct of the defendant;

(3)    The defendant must violate the statute or regulation;

(4)    The violation of the statute or regulation must be proximate cause of the plaintiff's injuries.[148]

At all relevant times, Pennsylvania law dictated that "[a]ny person who causes or participates in hazing commits a misdemeanor of the third degree."[149]  Hazing, in turn, was defined by the legislature as:

Any action or situation which recklessly or intentionally endangers the mental or physical health or safety of a person . . . for the purpose of initiation or admission into . . . any organization.  The term shall include, but not be limited to, . . . forced consumption of any . . . liquor . . . .  For purposes of this definition, any activity as described in this

---

[147] *Schemberg v. Smicherko*, 85 A.3d 1071, 1074 (Pa. Super. Ct. 2014).

[148] *Id.*

[149] 24 P.S. § 5353.

definition upon which the initiation or admission into . . . any organization is directly or indirectly conditioned shall be presumed to be "forced" activity, the willingness of an individual to participate in such activity notwithstanding.[150]

As noted above, Timothy Piazza attended the February 2, 2017 party in order to accept a bid to join the fraternity.[151] He was summoned there by a text from "pledge master" Casey, which text contained explicit instructions regarding the time of arrival ("9:07pm"); dress code ("shirt, tie[,] and jacket"); and location ("outside the kitchen doors behind the house").[152] Once there, he was directed through a series of drinking stations in rapid succession, consuming eighteen drinks in a 90-minute span along the way.[153] If these alleged facts are proven, a jury could find that Timothy Piazza's membership in the fraternity was conditioned, either directly or indirectly, upon his willingness and ability to consume an enormous amount of alcohol in a short period of time. And for the reasons discussed in Section II.A.2 of this Memorandum Opinion, the Complaint plausibly alleges that all Defendants either "cause[d] or participate[d] in" Timothy's hazing and that Defendants' conduct was a substantial factor in Timothy's death.[154]

Count IV, therefore, survives.

---

[150] *Id.* § 5352.

[151] Complaint ¶ 177.

[152] *Id.* ¶ 176.

[153] *Id.* ¶ 256.

[154] No Defendant argues that the purpose of the hazing statute was not, "at least in part, to protect the interest of a group of individuals, as opposed to the public generally." This Court, therefore, does not address whether this requirement of negligence per se has been satisfied.

### D.  Count V – Negligence Per Se for Furnishing Alcohol

Count V alleges that certain Defendants violated Pennsylvania's law prohibiting furnishing alcohol to minors[155] and that such violation amounted to negligence per se.  Defendants argue that this claim should be dismissed because the Complaint have failed to allege that they are over 21 years of age.  This Court agrees.

As discussed above, the Pennsylvania Supreme Court has declined to extend liability based on the social host doctrine to instances where the defendant is under 21 years of age.  Although the Piazzas are arguably attempting to advance their Count V claim on a negligence-per-se premise (and not a social-host-doctrine premise) this Court fails to see any meaningful distinction between the two theories of liability that would allow it to permit the Piazzas to maintain Count V without offending the policies announced in *Kapres*.

Count V, therefore, will be dismissed.  That dismissal, however, will be without prejudice, and the Piazzas may amend their complaint to allege that Defendants named in Count V were at least 21 years old on February 2, 2017.

### E.  Count VI – Civil Conspiracy

Under Pennsylvania law, a civil conspiracy exists where, inter alia, "two or more persons combine[ ]or agree[ ] . . . to do an unlawful act . . . [with] an intent to

---

[155]  18 Pa.C.S. § 6310.1(a) ("[A] person commits a misdemeanor of the third degree if he . . . intentionally and knowingly furnishes . . . any liquor or malt or brewed beverages to a person who is less than 21 years of age.").

injure."[156] Count VI of the Complaint is a civil conspiracy claim brought against all Defendants for their role in planning and operating Bid Acceptance Night. Defendants advance a number of arguments in their attempt to have this claim dismissed.

First, Defendants argue that the Complaint fails to allege that they actually "combined" or "agreed" to act unlawfully. Based on the allegations mentioned above in Section II.A.2 of this Memorandum Opinion[157] concerning all Defendants' role either planning or participating in Bid Acceptance Night, this Court can—and therefore must—infer that Defendants had some sort of implicit or explicit agreement to execute that evening's event. This argument therefore fails.

Second, Defendants argue that, because they were all members of the fraternity, they were legally incapable of conspiring amongst themselves. It is true that "a single entity cannot conspire with itself and, similarly, agents of a single entity cannot conspire among themselves."[158] However, such immunity arises only where the individual defendants are acting with the scope of the agency relationship.[159] Based on the fraternity's expressed anti-hazing policy, this Court

---

[156] *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979).

[157] The analysis of this Section also shows that the Complaint plausibly alleges causation for the Count VI civil conspiracy claim.

[158] *Grouse v. Proctor & Gamble Paper Products*, 866 A.2d 437, 441 (Pa. Super. Ct. 2005).

[159] *See General Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313-14 (3d Cir. 2003) (finding that the so-called "intracorporate conspiracy doctrine" applied where no "part of [the] Complaint contain[ed] allegations that the [defendants] acted outside their scope of representation, or allegations from which this even could be inferred").

can—and therefore must—infer that Defendants were acting outside the scope of any agency relationship they may have had with the fraternity itself. This argument therefore fails.

Third, Defendants argue that the conspiracy claim must fail because of the absence of an underlying unlawful act—i.e., the absence of an underlying tort.[160] As noted above, however, several of the Complaint's claims have survived these motions to dismiss. This argument therefore fails.

Fourth, Defendants argue that, because the tort underlying the civil conspiracy claim is negligence, the civil conspiracy claim must fail as a matter of law. It is true that allegations of merely negligent conduct cannot support a civil conspiracy claim.[161] However, while the Piazzas place a "negligence" label on Counts I through V, those claims are supported with allegations of intentional conduct—i.e., with allegations that Defendants purposefully planned and participated in the hazing of Timothy Piazza and the other pledges. This argument therefore fails.

Fifth, Defendants argue that the civil conspiracy claim should be dismissed because the Complaint fails to plead facts showing that Defendants acted with

---

[160] *See Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 405-06 (3d Cir. 2000) (explaining the "rule that [a] civil conspiracy may not exist without an underlying tort").

[161] *See Goldstein v. Phillip Morris, Inc.*, 865 A.2d 585, 590 (Pa. Super. Ct. 2004) ("Appellants have failed to plead or develop any separate underlying intentional or criminal act that can support a civil conspiracy claim. Strict liability and negligence counts are insufficient to support their civil conspiracy claim. Thus, [the civil conspiracy] claim could be dismissed on this basis alone.").

malice—i.e., with the sole purpose of injuring the Piazzas' son.[162]  This Court disagrees.  The Complaint alleges that Defendants planned and participated in[163] an event designed to encourage or coerce Timothy Piazza and the other pledges to consume as much alcohol as possible in a short period of time.  If these allegations are proven, a jury could infer that Defendants' sole purpose was to humiliate and endanger—i.e., to haze[164]—the young men hoping to join the fraternity.  This argument therefore fails.

Sixth, and finally, Defendants argue that Count VI should be dismissed to the extent it alleges a conspiracy to violate Pennsylvania's law prohibiting the furnishing of alcohol to minors.  For the reasons discussed in Section II.D of this Memorandum Opinion, this argument succeeds, and Count VI will be dismissed to the extent it relies upon this theory.  That dismissal, however, will be without prejudice, and the Piazzas may amend their complaint to allege that Defendants named in Count V were at least 21 years old on February 2, 2017.[165]

---

[162]  *See Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979) ("Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy.").

[163]  Defendants' alleged acts of planning and participating in the party also qualify as "overt act[s] done in pursuance of the [conspiracy's] purpose."  *General Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003).  Defendants argue that the Complaint fails to allege that *each of them* committed an overt act, but case law imposes no such requirement.  *See, e.g.*, *Baker v. Rangos*, 324 A.2d 498, 506 (Pa. Super. Ct. 1974) ("A conspiracy becomes actionable when *some* overt act is done in pursuance of the common purpose of design held by the conspirators, and actual legal damage results.").

[164]  *See Hazing*, Black's Law Dictionary (9th ed. 2009) ("The practice of *physically or emotionally abusing* newcomers to an organization as a means of initiation.") (emphasis added).

[165]  For the reasons discussed in Section II.C of this Memorandum Opinion, Count VI survives to the extent it is based on a conspiracy to violate Pennsylvania's anti-hazing law.

## F.    Counts VII, VIII, IX, X, XI, and XII - Battery

Counts VII, VIII, IX, X, XI, and XII are battery claims brought against Mr. Prior, Mr. Neuman, Mr. Casey, Mr. Ems, Mr. Coyne, and Mr. Reinmund for their allegedly offensive touching or contact of Timothy Piazza after his fall.  Mr. Coyne and Mr. Reinmund argue[166] that these claims should be dismissed because the Complaint fails to allege any injury resulting from the alleged touching or contact. This Court disagrees since, under Pennsylvania law, an action in battery requires "no physical injury, but only some contact."[167]

Mr. Coyne and Mr. Reinmund also argue that these claims should be dismissed because the Complaint fails to allege that their touching of Timothy was offensive.  This Court disagrees.  Under Pennsylvania law, a touching or bodily contact is offensive if it "offends a reasonable sense of personal dignity."[168]  The Complaint alleges that that Mr. Coyne strapped a backpack onto Timothy"[169] and that Mr. Reinmund "picked Timothy Piazza off of the floor and dropped him on the couch."[170]  Both contacts were allegedly done while Timothy "was in distress"[171]

---

[166] Mr. Prior, Mr. Neuman, Mr. Casey, and Mr. Ems do not move to dismiss the battery claims against them.

[167] *See Montgomery v. Bazaz-Sehgal*, 798 A.2d 742, 749 (Pa. 2002).

[168] *Herr v. Booten*, 580 A.2d 1115, 1117 (Pa. Super. Ct. 1990).

[169] Complaint ¶ 406.

[170] Complaint ¶ 409.

[171] *Id.* ¶ 406, 409.

and unconscious.[172]   If proven, a jury could find these contacts offensive.   This argument, therefore fails.

### G.    Count XIII – Intentional Infliction of Emotional Distress

Count XIII is an intentional infliction of emotion distress claim brought against Mr. Becker for his alleged role in trying to cover up the events of Bid Acceptance Night.  Mr. Becker argues that this claim should be dismissed because it fails to allege that he intended to harm the Piazzas with his actions.  This Court agrees.

To state a claim for intentional infliction of emotional distress under Pennsylvania law, a plaintiff must allege that the defendant undertook the complained-of conduct "with knowledge . . . that severe emotional distress [was] substantially certain" to result.[173]  The Piazzas argue that Mr. Becker committed this tort when he "intentionally or recklessly erased the basement camera video."[174] However, while the Complaint alleges that, by doing this, Mr. Becker "intended to prevent law enforcement and the Piazzas from having direct evidence to prove facts of the . . . hazing"[175] and "intended to prevent the Piazzas from obtaining justice in

---

[172]  *See id.* ¶¶ 282-291 (noting Defendants' unsuccessful attempts to rouse Timothy).

[173]  *L.H. v. Pittston Area School Dist.*, 130 F. Supp. 3d 918, 927 (M.D. Pa. 2015) (quoting *Forster v. Manchester*, 189 A.2d 147, 151 (Pa. 1963).

[174]  Complaint ¶ 412.

[175]  *Id.* ¶ 413.

their civil action and in other legal proceedings,"[176] the Complaint does not allege that Mr. Becker intended to emotionally harm them or their son.

The Piazzas point to *Papieves v. Lawrence*[177] to support their intentional infliction of emotional distress claim. That reliance is misplaced. In *Papieves*, the defendant struck a fourteen-year-old boy with his car.[178] Instead of obtaining medical help, the defendant hid the boy's body in his garage for a few days, and then buried it in a nearby field.[179] After the body was found, the boy's parents brought a claim against the defendant, seeking to recover for the "mental anguish, emotional disturbance, embarrassment, and humiliation" they had suffered.[180] The trial court held that plaintiffs had failed to state a claim upon which relief could be granted, and dismissed.[181] The Pennsylvania Supreme Court reversed.[182] After surveying case law from other jurisdictions, that court noted the "right of a decedent's nearest relatives to protection against intentional, outrageous[,] or wanton conduct which is peculiarly calculated to cause them serious mental or emotional distress" and concluded that "recovery may be had for serious mental or emotional distress directly caused by the intentional and wanton acts of *mishandling a decedent's*

---

[176] *Id.* ¶ 414.

[177] 263 A.2d 118 (1970).

[178] *Id.* at 119.

[179] *Id.*

[180] *Id.*

[181] *Id.*

[182] *Id.* at 122.

*body*."[183]  As clarified by a later Pennsylvania Supreme Court case, *Papieves* deals with the tort of interference with a corpse, not the tort of intentional infliction of emotional distress.[184]

At most, *Papieves* might be used to argue that mishandling a corpse reveals "knowledge on the part of the actor that severe emotional distress is substantially certain to be produced by his conduct."[185]  Mr. Becker, however, is not alleged to have done anything outrageous vis-à-vis Timothy's body.  And this Court cannot infer the requisite state of mind from Mr. Becker's video erasure alone.  Count XIII, therefore, will be dismissed.  That dismissal, however, will be without prejudice, and the Piazzas may file an amended complaint to address the identified shortcomings.[186]

### H.    Punitive Damages

The Complaint contains a demand for punitive damages.  Defendants argue that this demand should be dismissed because the Complaint fails to allege any outrageous conduct.

---

[183]  *Id.* at 121 (emphasis added).

[184]  *Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 988, 989 (Pa. 1987) (noting that "[t]he principle adopted in [*Papieves*] was derived from Restatement (First) of Torts § 868 (1939), which provides for liability to a decedent's family member *for the wanton mistreatment or intentional withholding of that decedent's corpse*.") (emphasis added); *see also Taylor v. Albert Einstein Medical Center*, 754 A.2d 650, 654 (Pa. 2000) (Castille, J., concurring) ("*Papieves* . . . involved the mistreatment of a corpse.  The tort recognized in *Papieves* is *sui generis*; indeed, it is the subject of a different, specific subsection of the Restatement.").

[185]  *L.H. v. Pittston Area School Dist.*, 130 F. Supp. 3d 918, 927 (M.D. Pa. 2015) (quoting *Forster v. Manchester*, 189 A.2d 147, 151 (Pa. 1963).

[186]  Mr. Funk and Mr. Mendgen also moved to dismiss any Count XIII claims against them, but the Complaint does not name those Defendants in Count XIII.

Under Pennsylvania law, an award of punitive damages is proper where only where a defendant's conduct is "outrageous," "malicious, wanton, reckless, willful, or oppressive."[187] Determining the appropriateness of punitive damages is a fact-intensive inquiry.[188] Consequently, this Court has routinely declined to dismiss punitive damages demands at the motion-to-dismiss stage, prior to discovery.[189] In light of the conduct alleged here—a night of arguably coerced binge drinking which resulted in the death of a 19-year-old college student—this Court sees no reason to depart from its usual practice. The demand for punitive damages, then, survives.

## I.    Motions to Strike

Defendants argue that certain portions of the Complaint should be stricken pursuant to Fed. R. Civ. P. 12(f). Specifically, Defendants ask this Court to strike:

- Paragraphs 143-150 of the Complaint, which allege that Mr. Casey and Mr. Young participated in hazing activities in 2016 and that one of the pledges involved in that hazing became injured and unwell.

- Paragraph 171 of the Complaint, which alleges that Mr. Casey and Mr. Kenyon discussed the ability of an unidentified pledge to drink alcohol on Bid Acceptance Night ("I talked to him and [h]e's off his meds . . . so he's good to drink . . . .").

- All allegations of conduct towards pledges other than Timothy Piazza.

---

[187] *Feld v. Merriam*, 485 A.2d 742, 747-48 (Pa. 1984).

[188] *See id.* at 748 ("[O]ne must look to the act itself together with all the circumstances including the motive of the wrongdoers and the relations between the parties.").

[189] *See Stahlnecker v. Morris*, 2019 WL 3003415 (M.D. Pa. July 10, 2019) at *3 ("This Court has consistently held that it is premature to dismiss demands for punitive damages prior to discovery.").

Motions to strike are granted only where "it is clear that [the material in question] is immaterial to the cause of action claimed."[190]  None of the challenged portions of the Complaint meet this standard.  The allegations in Paragraphs 143-150, if proven, could show Mr. Casey's and Mr. Young's knowledge of the dangerous effects of hazing.  The allegation in Paragraph 171, if proven, could show Mr. Casey's and Mr. Kenyon's knowledge of what was planned for Bid Acceptance Night.  And the allegations of conduct towards other pledges, if proven, could evince Defendants' implicit agreement to haze Timothy Piazza and those other pledges.

The challenged portions of the Complaint, therefore, survive.

## J.    Motions to Stay

Several Defendants have been criminally charged in the Court of Common Pleas of Centre County for their alleged actions during Bid Acceptance Night, and argue that this case should be stayed until those proceedings are complete.[191]

When deciding whether to stay a civil case pending resolution of a related criminal proceeding, this Court considers:

(1)    the extent to which the issues in the civil and criminal cases overlap;

(2)    the status of the criminal proceedings, including whether any defendants have been indicted;

---

[190]    *Rogers v. Mount Union Borough by Zook*, 816 F. Supp. 308, 317 (M.D. Pa. 1993).

[191]    *See* Mr. Becker's Motion to Stay (ECF No. 67); Mr. O'Brien's Motion to Stay (ECF No. 96); Mr. Kubera's Motion to Stay (ECF No. 133); Mr. Song's Motion to Stay (ECF No. 176); Mr. Young's Motion to Stay (ECF No. 188); Mr. Casey's Motion to Stay (ECF No. 212)

(3)     the plaintiff's interests in expeditious civil proceedings weighed against the prejudice to the plaintiff caused by the delay;

(4)     the burden on the defendants;

(5)     the interests of the court; and

(6)     the public interest.[192]

The parties agree that the issues in the civil and criminal cases are identical, since both cases seek to hold Defendants liable for the conduct they allegedly engaged in on Bid Acceptance Night.[193]  This factor, therefore—the "most important threshold issue"[194]—weighs strongly in favor of granting the stay.

Regarding the status of moving Defendants' criminal proceedings, moving Defendants appropriately point out that, while "[p]re-indictment requests to stay parallel civil litigation are routinely denied,"[195] all moving Defendants are all well past the indictment stage.  In fact, Mr. O'Brien,[196] Mr. Song,[197] and Mr. Becker[198] have either pled or been found guilty and are awaiting sentencing, and Mr. Young[199]

---

[192] *Barker v. Kane*, 149 F. Supp. 3d 521, 525-26 (M.D. Pa. 2016).

[193] *See* Plaintiffs' Brief in Opposition (ECF No. 191) at 127 ("The civil and criminal matters overlap.").

[194] *Barker*, 149 F. Supp. 3d at 526.

[195] *Id.* at 527.

[196] *See Commonwealth v. Aidan M. O'Brien*, No. CP-14-CR-885-2018 (Ct. Com. Pl. Centre Cty. filed May 11, 2018).

[197] *See Commonwealth v. Bo Han Song*, No. CP-14-CR-887-2018 (Ct. Com. Pl. Centre Cty. filed May 11, 2018).

[198] *See Commonwealth v. Braxton Robert Becker*, No. CP-14-CR-1893-2018 (Ct. Com. Pl. Centre Cty. filed Nov. 30, 2018).

[199] *See Commonwealth v. Brendan Patrick Young*, No. CP-14-CR-1389-2017 (Ct. Com. Pl. Centre Cty. filed Sept. 1, 2017); *Commonwealth v. Brendan Patrick Young*, No. CP-14-CR-784-2018

and Mr. Casey[200] are currently appealing pre-trial rulings to the Pennsylvania Superior Court.[201]  The presumption (if it can be called such) against pre-indictment stays, however, is based on the "uncertainty surrounding when, if ever, indictments will be issued,"[202] and courts routinely note the ability to discern the length of the delay when granting post-indictment stays.[203]  Here, it is unclear how long Mr. Young's and Mr. Casey's appeals will take to resolve,[204] and Mr. O'Brien's, Mr. Song's, and Mr. Becker's sentencings have apparently been stayed pending resolution of the criminal cases against the other Defendants.  This factor, therefore, weighs against granting the stay.[205]

---

(Ct. Com. Pl. Centre Cty. filed May 3, 2018); *Commonwealth v. Brendan Patrick Young*, No. CP-14-CR-1540-2018 (Ct. Com. Pl. Centre Cty. filed Sept. 14, 2018).

[200]  *See Commonwealth v. Daniel Casey*, No. CP-14-CR-1377-2017 (Ct. Com. Pl. Centre Cty. filed Sept. 1, 2017); *Commonwealth v. Daniel Casey*, No. CP-14-CR-781-2018 (Ct. Com. Pl. Centre Cty. filed May 3, 2018); *Commonwealth v. Daniel Casey*, No. CP-14-CR-1536-2018 (Ct. Com. Pl. Centre Cty. filed Sept. 14, 2018).

[201]  *See Commonwealth v. Brendan Patrick Young*, No. 2088 MDA 2018 (Pa. Super. Ct. filed Dec. 21, 2018); *Commonwealth v. Daniel Casey*, No. 2089 MDA 2018 (Pa. Super Ct. filed Dec. 21, 2018); *Commonwealth v. Daniel Casey*, No. 7 MDM 2019 (Pa. Super. Ct. filed Feb. 14, 2019).

[202]  *State Farm Mut. Automobile Ins. Co. v. Beckham-Easley*, No. Civ.A. 01-5530, 2002 WL 31111766 (E.D. Pa. Sept. 18, 2002).

[203]  *See, e.g.*, *Barker*, 149 F. Supp. at 528 (noting, where defendant's trial was scheduled to begin in five months, that "a limited stay of this duration will not cause the litigation to stagnate in any enduring fashion"); *id.* ("Given the advanced stage of the criminal case and the circumscribed timeline of the requested stay, this factor counsels strongly in favor of granting the motion [to stay].").

[204]  *See Librado v. M.S. Carriers, Inc.*, No. Civ.A. 3:02-CV-2095D, 2002 WL 31495988, at *2 (N.D. Tex. Nov. 5, 2002) (noting that "imposition of a stay lasting throughout the duration of [defendant's] direct appeal (if he is convicted) would likely be unduly burdensome to plaintiffs' interests").

[205]  Because Mr. Kubera has already been sentenced, his motion to stay will be denied as moot. *See Commonwealth v. Nicholas Joseph Kubera*, No. CP-14-CR-1383-2017 (Ct. Com. Pl.

Moving onto the next factor, it is true that the Piazzas—like almost all other civil litigants—have an interest in proceeding expeditiously.  And it is also true that, during a stay, "[w]itnesses relocate, memories fade, and persons allegedly aggrieved are unable to seek vindication or redress."[206]  The mere possibility of a "less expeditious resolution," however, "is insufficient to show prejudice," especially since the Piazzas have pointed to no "particularly unique injury, such as the dissipation of assets or an attempt [by Defendants] to gain an unfair advantage from the stay."[207]  This factor, therefore, weighs in favor of granting the stay.

Regarding the burden on the Defendants, the Piazzas do not dispute that, if forced to proceed, Defendants "face[] the difficult choice of asserting [their] Fifth Amendment rights at the risk of losing a civil trial, or waiving these rights to defend [themselves] in civil proceedings at the risk of incriminating [themselves]."[208]  This is true even for Mr. O'Brien, Mr. Song, and Mr. Becker—i.e., the moving Defendants whose guilt has been determined—since the privilege against self-

---

Centre Cty. filed Sept. 1 2017); *Commonwealth v. Nicholas Joseph Kubera*, No. CP-14-CR-1537-2018 (Ct. Com. Pl. Centre Cty. filed Sept. 14, 2018).

[206] *See In re Mid-Atlantic Toyota Antitrust Litigation*, 92 F.R.D. 358, 359 (D. Md. 1981).

[207] *Barker*, 149 F. Supp. 3d at 528.

[208] Brief in Opposition at 131 (quoting *Beckham-Easley*, 2002 WL 3111766, at * 3).  *See also Baker*, 149 F. Supp. 3d at 529 ("The risk of self-incrimination is greatest when significant overlap exists between civil and criminal matters and criminal charges have been filed against the defendant.").

incrimination extends beyond adjudication or admission of guilt.[209]  This factor, therefore, weighs in favor of granting the stay.[210]

The existence of the Fifth Amendment privilege also bears on the final two factors, since although this Court and the public have an interest in timely resolution of cases,[211] there is also an interest in efficiency and conservation of judicial resources, which interest would be impaired if this Court had to weigh in on discovery disputes sparked by an assertion of the privilege.[212]  These factors, therefore, weigh neither in favor nor against granting the stay.

Considering all of the above, this Court determines that a limited stay of some discovery and proceedings against Mr. O'Brien, Mr. Song, Mr. Becker, Mr. Young, and Mr. Casey is appropriate.[213]  Those Defendants will not be required (1) to answer the Complaint or any crossclaims brought against them; (2) to respond to any interrogatories; or (3) to sit for any depositions, if—and only if—they would implicate their Fifth Amendment right against self-incrimination by doing so.[214]

---

[209]  *See Mitchell v. United States*, 526 U.S. 314, 325-26 (1999).

[210]  If Defendants assert this privilege during discovery, Plaintiffs may also suffer, since they might be unable to obtain evidence necessary or favorable to their case.

[211]  *See Barker*, 149 F. Supp. 3d at 259 ("Both the court and the public have a compelling interest in the efficient resolution of cases.").

[212]  *See Walsh Securities, Inc. v. Cristo Property Management, Ltd.*, 7 F. Supp. 2d 523, 528 (D.N.J. 1998); *Barker*, 149 F. Supp. 3d at 529.

[213]  *See In re Worldcom, Inc. Securities Litigation*, Nos. 02 Civ. 3288(DLC), 02 Civ. 2816(DLC), 2002 WL 31729501, at *11 (S.D.N.Y. Dec. 5, 2002) (staying case as to some, but not all, defendants).

[214]  Mr. Becker's motion to stay focuses on the intentional infliction of emotional distress claim, since the criminal charges brought against him relate to the alleged conduct underlying that

They should, however, participate in any and all discovery and proceedings that do not touch on this Constitutional right. Due to the number of other Defendants in this case who remain available for depositions, interrogatories, and the like, this stay will likely have little to no impact on the length of the proceedings overall. And in no event will this Court allow this stay to affect the potential liability of the other Defendants.[215]

## III. CONCLUSION

For the reasons discussed above, the motions to dismiss and to stay will be granted in part and denied in part. An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

claim. *See* Mr. Becker's Brief in Support (ECF No. 71) at 3-4; *id.* at 6 ("Any discovery regarding the alleged conduct pertaining to the intentional infliction of emotional distress claim will directly relate to the criminal charges brought against [Mr. Becker].")." As noted above, this Court is dismissing the intentional infliction of emotional distress claim but is allowing the Piazzas to amend it. If the Piazzas do not replead the intentional infliction of emotional distress claim, the stay is inapplicable to Mr. Becker and he should fully participate in discovery.

[215] *Cf. Walsh*, 7 F. Supp. 2d at 528-29 ("[I]f some some defendants were forced to assert the privilege while others were not, it would be difficult or impossible to fairly apportion liability because of the differing factual record among defendants.").